No. 23-13851-A

# United States Court of Appeals

## *for the*

# Eleventh Circuit

———————— ◆ ————————

ROBERT MARTIN,

*Plaintiff-Appellee,*

– v. –

ERIC BISCHOFF,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA,
DOCKET NO. 8:21-CV-01045-MSS-AAS

## BRIEF FOR DEFENDANT-APPELLANT

MICHAEL E. SWARTZ
TALEAH E. JENNINGS
RANDALL T. ADAMS
MINJI REEM
MARK L. GARIBYAN
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022
(212) 756-2000

DUANE A. DAIKER
JAIME AUSTRICH
BRIAN W. SCHAFFNIT
SHUMAKER, LOOP & KENDRICK, LLP
101 East Kennedy Boulevard
Tampa, Florida 33602
(813) 229-7600

*Attorneys for Defendant-Appellant*

*Robert Martin v. Eric Bischoff*, No. 23-13851-A

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1 *et seq*., Defendant-Appellant Eric Bischoff states the following trial judges, attorneys, persons, association of persons, firms, partnerships, or corporations have an interest in the outcome of this appeal:

1. Adams, Randall T. (Counsel for Defendant-Appellant)

2. Austrich, Jaime (Counsel for Defendant-Appellant)

3. Bennett, Justin P. (Counsel for Plaintiff-Appellee)

4. Bischoff, Eric (Defendant-Appellant)

5. Buese, Alexis Miller (Counsel for Plaintiff-Appellee)

6. Daiker, Duane A. (Counsel for Defendant-Appellant)

7. Daly, Matthew C. (Counsel for Plaintiff-Appellee)

8. Dietrich, Daniel P. (Counsel for Plaintiff-Appellee)

9. Garibyan, Mark L. (Counsel for Defendant-Appellant)

10. Golenbock Eiseman Assor Bell & Peskoe LLP (Counsel for Plaintiff-Appellee)

11. Gunster, Yoakley & Stewart, P.A. (Counsel for Plaintiff-Appellee)

12. Hyman, Martin S. (Counsel for Plaintiff-Appellee)

13. Jennings, Taleah E. (Counsel for Defendant-Appellant)

14. Koche, David L. (Counsel for Plaintiff-Appellee)

*Robert Martin v. Eric Bischoff*, No. 23-13851-A

15.    Martin, Robert P. (Beneficiary of the RPM 2005 Family Trust)

16.    Martin, Robert S., as trustee of the Martin 2008-A Investment Trust, the Martin 2013-A Investment Trust, the RPM 2005 Family Trust, and the RSM 1988 Trust (Plaintiff-Appellee)

17.    Martin, Robert S., in his individual capacity

18.    Reem, Minji (Counsel for Defendant-Appellant)

19.    Sansone, Amanda Arnold (U.S. Magistrate Judge)

20.    Saviano, Edward S. (Counsel for Defendant-Appellant)

21.    Saviano PC (Counsel for Defendant-Appellant)

22.    Schaffnit, Brian W. (Counsel for Defendant-Appellant)

23.    Schifino, William J. (Counsel for Plaintiff-Appellee)

24.    Schulte Roth & Zabel LLP (Counsel for Defendant-Appellant)

25.    Scriven, Mary S. (U.S. District Judge)

26.    Shumaker Loop & Kendrick, LLP (Counsel for Defendant-Appellant)

27.    Swartz, Michael E. (Counsel for Defendant-Appellant)

\* \* \*

Pursuant to Eleventh Circuit Rule 26.1-3(b), Defendant-Appellant Eric Bischoff certifies that there is no publicly traded company or corporation that has an interest in the outcome of this case or appeal.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Eric Bischoff respectfully requests oral argument.  This appeal concerns whether the statute of limitations can function to make a void act valid through the passage of time.  Determination of the appeal would impact directly the ownership of Boar's Head Provisions Co., Inc. and may carry significant repercussions for other closely held family businesses.  Oral argument would substantially assist the Court in resolving these and other important issues.

## <u>TABLE OF CONTENTS</u>

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF CONTENTS......................................................................... ii

TABLE OF CITATIONS ........................................................................v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION ....1

INTRODUCTION ...........................................................................................2

STATEMENT OF THE ISSUES...................................................................6

STATEMENT OF THE CASE...........................................................................8

    I.    Factual Background...........................................................................8

        A.    Since Its Founding, Boar's Head Has Been a Closely Held Family Business with Strict Restrictions on Transfers of Shares. ........................................................................8

        B.    The Present-Day Boar's Head Shareholder's Agreement Continues to Impose Stringent Share Transfer Restrictions.......8

            1.    Attempted Transfers That Fail to Comply with the Transfer Restrictions Are Void *Ab Initio*. ......................10

            2.    The Shareholder's Agreement Specifies Narrow Categories of Permitted Transfers. ..................................11

        C.    From 2011 to 2016, the RSM Trust Purports to Transfer Its Shares to the RPM Trust Without Notifying Eric. ..................13

            1.    In 2011, the RSM Trust Purports to Transfer 2.4 Shares (Representing 0.05% of the Company) to the RPM Trust Pursuant to the Immediate Family Provision. .......................................................................14

2. In 2013 and 2016, the RSM Trust Purports to Transfer 720 Shares (Representing 15% of the Company) to the RPM Trust. ..........................................14

3. RSM's and the Company's Concealment of the Three Transfers Following Eric's Departure from Boar's Head. .................................................................14

II. District Court Proceedings ...................................................17

    A. Procedural History ....................................................17

        1. RSM's Claims...................................................18

        2. Eric's Counterclaims ......................................19

    B. The Cross-Motions for Summary Judgment.............................19

    C. The District Court Grants in Part and Denies in Part as Moot RSM's Motion for Summary Judgment........................20

III. Standard of Review ..............................................................23

SUMMARY OF ARGUMENT ........................................................25

ARGUMENT ......................................................................................27

I. THE DISTRICT COURT ERRED AS A MATTER OF LAW BY FINDING THAT THE THREE TRANSFERS WERE VALID. .......27

    A. Any Attempted Transfer of Boar's Head Shares Must Comply with the Shareholder's Agreement's Transfer Restrictions.................................................................29

    B. The District Court Erred by Failing to Assess Whether the Three Transfers Complied with the Transfer Restrictions. ......32

        1. The Statute of Limitations Does Not Exempt the 2011 Transfer from the Transfer Restrictions. ..............33

        2. The 2011 Transfer Documents and Isolated Language from the Shareholder's Agreement Are Meaningless Unless the 2011 Transfer Complied with the Transfer Restrictions. ................................................................39

C.    Eric's Declaratory Judgment Counterclaim Challenging the 2011 Transfer Is Not Time-Barred. ..........................................43

1.    Under New York Law, the Statute of Limitations Is Not a Defense to an Action Seeking a Declaration That a Contract Is Void *Ab Initio*. ..................................44

2.    The District Court's Statute of Limitations Analysis Was Flawed as a Matter of Law. ....................................47

II.    RSM SHOULD BE EQUITABLY ESTOPPED FROM RELYING ON THE STATUTE OF LIMITATIONS DEFENSE. ....51

A.    The District Court Abused Its Discretion in Finding That Eric Waived His Equitable Estoppel Defense. ........................52

B.    The District Court Erred in Concluding That There Is No Genuine Issue of Material Fact as to the Elements of Eric's Equitable Estoppel Defense. ....................................................56

CONCLUSION ...................................................................................58

CERTIFICATE OF COMPLIANCE ......................................................60

CERTIFICATE OF SERVICE .............................................................61

iv

# <u>TABLE OF CITATIONS</u>

**Cases**                                                                                              **Page(s)**

*1650 Realty Assocs.*, LLC v. Golden Touch Mgmt., Inc.,
    No. 005408/11, 2012 WL 12878252 (N.Y. Sup. Ct. Nov. 9, 2012) .................46

*Abdullayeva v. Attending Homecare Servs. LLC*,
    928 F.3d 218 (2d Cir. 2019) .............................................................................43

*Ahmad v. Furlong*,
    435 F.3d 1196 (10th Cir. 2006) .......................................................................55

*Aloi v. Bd. of Educ. of W. Babylon Union Free Sch. Dist.*,
    439 N.Y.S.2d 169 (App. Div. 1981).................................................................47

*Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*,
    832 F.3d 1318 (11th Cir. 2016) .......................................................................23

*Auction House 43, Inc. v. Koblence*,
    126 N.Y.S.3d 849 (Table), 2020 WL 2044437 (N.Y. Sup. Ct.
    2020) ...............................................................................................................46

*Bailey v. Fish & Neave*,
    868 N.E.2d 956 (N.Y. 2007).............................................................................43

*Bank of N.Y Mellon v. WMC Mortg., LLC,*
    39 N.Y.S.3d 892 (N.Y. Sup. Ct. 2016).............................................................36

*Contour Constr., LLC v. Kohlbach*,
    880 N.Y.S.2d 871 (Table), 2009 WL 792397 (N.Y. Sup. Ct. 2009).................47

*Davenport v. Thor Motor Coach, Inc.*,
    No. 3:14-cv-537-J25-PDB, 2015 WL 13021664 (M.D. Fla. Aug. 6,
    2015), *aff'd per curiam*, 661 F. App'x 997 (11th Cir. 2016) ...........................49

*Easterwood v. CSX Transp., Inc.*,
    933 F.2d 1548 (11th Cir. 1991), *aff'd*, 507 U.S. 658 (1993).............................56

*Edwards v. Fulton County*,
    509 F. App'x 882 (11th Cir. 2013) ..............................................................52, 53

**\*\*Faison v. Lewis,**
 32 N.E.3d 400 (N.Y. 2015)......................................................................45, 46, 47

*Garrett v. Music Publ'g Co. of Am., LLC*,
 740 F. Supp. 2d 457 (S.D.N.Y. 2010) .................................................................58

**\*\*Genger v. Genger,**
 No. 651089/2010, 2015 WL 112831 (N.Y. Sup. Ct. Jan. 7, 2015),
 *aff'd,* 22 N.Y.S.3d 433 (App. Div. 2016) .........................................29, 40, 44, 49

*Gilmour v. Gates, McDonald & Co.*,
 382 F.3d 1312 (11th Cir. 2004) ...........................................................................51

*Grant v. Preferred Rsch., Inc.*,
 885 F.2d 795 (11th Cir. 1989) ........................................................................53, 54

*Hassan v. U.S. Postal Serv.*,
 842 F.2d 260 (11th Cir. 1988) ........................................................................52, 53

*Hetchkop v. Woodlawn at Grassmere, Inc.*,
 116 F.3d 28 (2d Cir. 1997) .............................................................................44, 45

*Hulbert v. Clark,*
 28 N.E. 638 (N.Y. 1891).......................................................................................36

*Hurlbert v. St. Mary's Health Care Sys., Inc.*,
 439 F.3d 1286 (11th Cir. 2006) ...........................................................................51

**\*\*Johnson v. Albany & Susquehanna R.R. Co.,**
 54 N.Y. 416 (1873) .........................................................................................35, 37

*Karedes v. Colella*,
 790 N.E.2d 257 (N.Y. 2003)..................................................................................46

**\*\*Kavanaugh v. Kavanaugh,**
 161 N.Y.S.3d 558 (App. Div. 2021)..................................................................37, 38

*Keybank Nat'l Ass'n v. Hamrick*,
 No. 1:10-CV-04054-JOF, 2012 WL 13006041 (N.D. Ga. Aug. 17,
 2012) .....................................................................................................................55

*Keybank Nat'l Ass'n v. Hamrick*,
 576 F. App'x 884 (11th Cir. 2014)........................................................................55

*Langston v. MFM Contracting Corp.*,
   102 N.Y.S.3d 12 (App. Div. 2019) ...................................................57

*Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ............................................................42

*Mason v. Henry*,
   31 N.Y.S. 1068 (Gen. Term 1895), *aff'd,* 46 N.E. 837 (N.Y. 1897).................35

*Nusca v. Fodera*,
   514 N.Y.S.2d 65 (App. Div. 1987) .................................................47

*Pacchiana v. Pacchiana*,
   462 N.Y.S.2d 256 (App. Div. 1983) ...............................................45

*In re Penepent Corp.*,
   750 N.E.2d 47 (N.Y. 2001) ...............................................................27

*Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*,
   684 F.3d 1211 (11th Cir. 2012) ......................................................54

*Plumbers & Steamfitters Loc. No. 150 Pension Fund v. Vertex Constr. Co.*,
   932 F.2d 1443 (11th Cir. 1991) ......................................................48

*Proctor v. Fluor Enters., Inc.*,
   494 F.3d 1337 (11th Cir. 2007) ................................................24, 55

*Est. of Re by Coarsely v. Kornstein Veisz & Wexler*,
   958 F. Supp. 907 (S.D.N.Y. 1997) .................................................30

\*\**Riverside Syndicate, Inc. v. Munroe*,
   882 N.E.2d 875 (N.Y. 2008)...............................................45, 46, 47

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
   531 U.S. 497 (2001).........................................................................34

*Sweet v. Sec'y, Dep't of Corr.*,
   467 F.3d 1311 (11th Cir. 2006) ......................................................52

\*\**Vardanyan v. Close-Up Int'l, Inc.*,
   No. CV-06-2243 (DGT), 2007 WL 4276670 (E.D.N.Y. Nov. 30, 2007), *aff'd*, 315 F. App'x 315 (2d Cir. 2009) ...........................27, 30, 40, 44, 49

*Vazquez v. Metro. Dade Cnty.*,
968 F.2d 1101 (11th Cir. 1992) ...........................................................24

*Wagner v. Pegasus Cap. Advisors, L.P.*,
No. 654613/2019, 2020 WL 6114704 (N.Y. Sup. Ct. Oct. 16,
2020), *aff'd*, 150 N.Y.S.3d 718 (App. Div. 2021)................................37

**Statutes & Rules**

28 U.S.C. § 1291 .....................................................................................1

28 U.S.C. § 1332 .....................................................................................1

N.Y. Code of Civ. Proc. § 91 (1855) .....................................................35

N.Y. Civil Practice Law & Rules ("CPLR"),

CPLR § 213(2).......................................... 6, 21, 35, 44, 45, 46, 47, 48

Fed. R. App. P. 26.1 ............................................................................C-1

Fed. R. App. P. 32 .................................................................................60

Fed. R. Civ. P. 8 ..........................................................................48, 50, 52


**Other Authorities**

1 Moore's Manual - Federal Practice and Procedure § 10.03 .................33

17A Am. Jur. 2d *Contracts* § 9 (2024) ..................................................44

22 N.Y. Jur. 2d *Contracts* § 8 (2023) ....................................................30

75 N.Y. Jur. 2d *Limitations and Laches* § 23 (2023) .........................33, 34

David D. Siegel & Patrick M. Connors, N.Y. Prac. § 34 (6th ed.
2023). .................................................................................................34

*Void*, BLACK'S LAW DICTIONARY (11th ed. 2019)..................................30

## STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION

The District Court had diversity jurisdiction under 28 U.S.C. § 1332 because Appellant Eric Bischoff ("Eric") and Appellee Robert S. Martin ("RSM"), in his individual capacity and in his capacity as a trustee of the Martin 2008-A Investment Trust and Martin 2013-A Investment Trust (collectively, the "RSM Trust"), RPM 2005 Family Trust, and RSM 1988 Trust, are citizens of different states (New York and Florida, respectively) and the amount in controversy exceeds $75,000, excluding attorneys' fees and costs.  [Doc. 1 at 4, ¶ 5; Doc. 12 at 5, ¶ 14.][1]

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 because this is an appeal from a final judgment.  On October 27, 2023, the District Court granted in part and denied in part, as moot, RSM's Motion for Summary Judgment, which disposed of all claims in RSM's favor.  [Doc. 82.]  Eric timely filed a Notice of Appeal on November 27, 2023.  [Doc. 84.]

---

[1] References herein to [Doc. __ ] are to the document and page numbers as generated by the district court's electronic filing system.

## <u>INTRODUCTION</u>

The District Court committed reversible error when granting summary judgment against Eric and in favor of RSM in this dispute between two co-owners who are  descendants of the founders of Boar's Head Provisions Co., Inc. ("<u>Boar's Head</u>" or the "<u>Company</u>"), the nationally-famous delicatessen food products company.  The core issue in this action is whether RSM's son, Robert P. Martin ("<u>RPM</u>"), or a trust for his benefit (the "<u>RPM Trust</u>"), is a permitted transferee under the transfer restrictions set forth in the controlling 1991 Shareholder's Agreement [Doc. 49-1 (the "<u>Shareholder's Agreement</u>" or "<u>SHA</u>")].  Eric contends that RPM is <u>not</u> a permitted transferee under the Shareholder's Agreement and, therefore, transfers of shares to the RPM Trust are void.  Nevertheless, through misapplication of the statute of limitations, the District Court never reached that issue and thereby improperly transformed void transfers into valid ones.

As is typical of closely held family businesses like Boar's Head, the Shareholder's Agreement's transfer restrictions impose stringent eligibility requirements on transferees, unless the transferees are existing Shareholders under the Shareholder's Agreement, in which case they may validly receive subsequent share transfers.  Further, the Shareholder's Agreement expressly provides that non-compliant transfers are void.

The District Court never reached the Shareholder's Agreement's eligibility requirements because it held that Eric is time-barred from challenging the RSM Trust's initial 2011 transfer of its Boar's Head shares to the RPM Trust.  At the same time, the District Court side-stepped the time bar to rule that the 2011 transfer rendered the RPM Trust a Shareholder under the Shareholder's Agreement, without ever grappling with whether the transfer was void under its terms.  The District Court then proceeded to hold that the RSM Trust's two subsequent transfers to the RPM Trust in 2013 and 2016 were validly made to an existing Shareholder.  As such, the District Court overrode the terms of the Shareholder's Agreement by deeming the RPM Trust to be a valid Shareholder regardless of whether the initial transfer was void.  That was reversible error.

It is axiomatic that the passage of time does not turn a legal wrong into a legal right.  Under that cardinal principle, a statute of limitations is a procedural defense to a remedy only.  A statute of limitations cannot create or wipe out substantive rights by overriding the Shareholder's Agreement's eligibility requirements, even where it serves to prevent a plaintiff from obtaining monetary or injunctive relief for the time-barred act.

More specifically, the District Court ruled that, because the initial transfer of shares to the RPM Trust in 2011, representing a mere 1/2000th of an interest in the Company, took place beyond the statute of limitations, Eric has no ability to

challenge the subsequent transfers of 15% of outstanding shares in 2013 and 2016 that took place within the limitation period. In doing so, the District Court wrongly endorsed RSM's use of the statute of limitations as a sword and a shield.

The internal inconsistency in the District Court's opinion proves Eric's point. Even though the District Court refused to consider the validity of the 2011 transfer, *i.e.*, whether it satisfied the Shareholder's Agreement's eligibility requirements, it effectively held that the transfer documents that purportedly effectuated that transfer were valid.

The District Court also erred by applying the statute of limitations in the first place. Under New York law, the six-year statute of limitations does *not* apply to declarations of voidness, especially where, as here, the Shareholder's Agreement provided that transfers made in violation of the transfer restrictions "shall be void." Thus, Eric was not out of time to challenge the 2011 transfer.

In any event, RSM should be equitably estopped from relying on the statute of limitations defense due to his concealment of the three transfers at issue, and the District Court abused its discretion in finding that Eric waived that argument by not raising it as an affirmative defense in his pleadings. As this Court has held, whether a party waived an affirmative defense depends on whether the other party was on notice of the defense and could legitimately claim surprise and prejudice from a failure to plead the defense affirmatively. There is no question that RSM was on

notice of the defense because his own pleadings placed Eric's knowledge of the transfers at issue, and RSM went to great lengths during discovery to attempt to disprove the notion that the three transfers were concealed from Eric.  RSM did not even attempt to claim he was prejudiced by the delay because he was not.

The District Court's decision should be reversed and the case should be remanded.

## <u>STATEMENT OF THE ISSUES</u>

1.  Whether the District Court erred in failing to determine whether the 2011 Transfer was void for failure to comply with the Shareholder's Agreement's Transfer Restrictions on the basis that Eric's claims challenging that transfer were time-barred, while at the same time holding that (i) the 2011 Transfer established the RPM Trust as a Boar's Head Shareholder under that same Shareholder's Agreement, and therefore, (ii) the 2013 and 2016 Transfers were valid.

2.  Whether the District Court erred in finding that Eric's counterclaim seeking a declaration that the 2011 Transfer was void *ab initio* is barred by the six-year limitations period under New York Civil Practice Law & Rules § 213(2) applicable to actions upon a contractual obligation or liability.

3.  Whether the District Court erred in finding that Eric waived his equitable estoppel defense because Eric did not plead it in his answer, even though:

    a.  the record reflects that RSM was on notice of the defense throughout the proceedings, including during discovery;

    b.  RSM never claimed he was prejudiced by the delay; and

    c.  Eric asserted the defense on summary judgment.

4.    Whether the District Court erred by holding, in the alternative, that, even if Eric could raise the equitable estoppel argument, there is no genuine issue of material fact as to all of the elements of Eric's equitable estoppel defense.

## STATEMENT OF THE CASE

I.  **FACTUAL BACKGROUND**

   **A. Since Its Founding, Boar's Head Has Been a Closely Held Family Business with Strict Restrictions on Transfers of Shares.**

Boar's Head was co-founded in 1933 by brothers-in-law Frank Brunckhorst Jr. ("Frank Jr.") and Bruno Bischoff ("Bruno"), and their partner Theodore Weiler ("Weiler").  [Doc. 55 at 3, ¶ 2.]  Since 1988, Boar's Head has been wholly owned by descendants of Frank Jr. and Bruno, or trusts for their benefit.  [*Id.* at 4-5, ¶¶ 6-16; Doc. 49-16 at 5 ¶¶ 2-4.]

The founders of Boar's Head intended that the Company remain a closely held family business.  Therefore, in 1963, Frank Jr. and Bruno, together with their spouses and children, agreed not to transfer their Company interests to anyone—including each other—absent unanimous consent.  [Doc. 49-5 at 7, ¶ 12(a).]  They also agreed that, with each owner's death, the decedent's interest would be consolidated by the surviving owners and would not transfer down the line of succession.  [*Id.* at 8-9, ¶¶ 13-14.]  Those transfer restrictions controlled the families' interests in Boar's Head for decades.  [Doc. 49-9 at 2-14, ¶¶ 1-5.]

   **B. The Present-Day Boar's Head Shareholder's Agreement Continues to Impose Stringent Share Transfer Restrictions.**

At issue in this appeal is the 1991 Boar's Head Shareholder's Agreement, which continues in effect.  [Doc. 49-1; Doc. 55 at 4-8 ¶ 15.]  Its express purpose is for the Shareholders "to maintain ownership and control of [Boar's Head] among

themselves for the purpose of insuring continuity of management among themselves and to provide for the orderly disposition of the shares of capital stock of [Boar's Head]." [Doc. 49-1 at 2-3.]

The Shareholder's Agreement delineates "Shareholders" into two groups: Group A and Group B Shareholders. [Doc. 49-1 at 2.] The instant dispute concerns only Group B Shareholders.

When the Shareholder's Agreement was executed, four individuals signed on behalf of Group B Shareholders, namely Eric, RSM, and two trustees for the Alvina Martin 1988 Trust (the "Alvina Trust"), a trust established for the benefit of Alvina Martin. [Doc. 49-1 at 2; Doc. 55 at 3-4, ¶¶ 4, 11-13.] Alvina was Bruno's daughter and, therefore, a second generation family member, while Eric and RSM are Bruno's grandchildren and, as such, third generation family members.

The parties' dispute centers on whether a trust for the benefit of RPM, RSM's son and a fourth generation family member, is eligible to receive shares under the Shareholder's Agreement. A family tree of each generation of Bischoff's descendants is depicted below:



[Doc. 55 at 4, ¶¶ 11-13.]

### 1. Attempted Transfers That Fail to Comply with the Transfer Restrictions Are Void *Ab Initio*.

Paragraph 3(a) of the Shareholder's Agreement broadly prohibits any disposition of shares *except* in certain narrow circumstances (the "Transfer Restrictions").  It provides, in relevant part:

> [N]o Shareholder, **either directly or indirectly**, shall **sell**, **assign**, mortgage, hypothecate, **transfer**, pledge, create a security interest in or lien upon, encumber, give, place in trust, or **otherwise voluntarily or involuntarily dispose of any of the Shares** now owned or hereafter acquired by said Shareholder, **except as hereinafter provided**.

[Doc. 49-1 at 4, ¶ 3(a) (emphasis added).]

The Transfer Restrictions further provide that "[a]ny **attempted** disposition of shares, either voluntary, involuntary or by operation of law," that is prohibited under the Shareholder's Agreement "**shall be void**" and "shall immediately give the Corporation and the Shareholders the option to purchase the Shares[.]"  [*Id.* at 4-5, ¶ 3(a) (emphasis added).]

### 2. The Shareholder's Agreement Specifies Narrow Categories of Permitted Transfers.

The Shareholder's Agreement, under Paragraphs 3(b) and 4, specifies to whom and how an existing Shareholder may transfer shares in order for the transfer to comply with the Transfer Restrictions. Any attempted transfer that does not comply with those specifications "shall be void." [Doc. 49-1 at 4, ¶ 3(a).]

An existing Group B Shareholder may transfer some or all of their shares to four categories of permitted transferees:

(i) other existing Group B Shareholders (or a trust for their benefit) [*id.* at 5, ¶ 3(b)(ii)];

(ii) an "immediate family" member of RSM's mother, Alvina Martin ("Alvina"), including her nieces and nephews but excluding her spouse, who are also active Boar's Head employees[2] (or a trust for their benefit) (the "Immediate Family Provision") [*id.*];

(iii) "a beneficiary of [the Alvina Trust] to whom Shares are permitted to be transferred under the terms of the Trust Agreement" as of 1991 (the "Alvina Trust Provision") [*id.*]; or

(iv) anyone pursuant to a right of refusal [*id.* at 9-11, ¶¶ 4(a)-(d)].

---

[2] The parties do not dispute that RPM was an active employee (as defined in the Shareholder's Agreement) at the time of the Three Transfers.

Those four categories of recipients are collectively referred to herein as "Permitted Transferees".

**Existing Group B Shareholders.** Existing Group B Shareholders may freely transfer shares to one another. [Doc. 49-1 at 5, ¶ 3(b)(ii).] A non-Shareholder may become a Group B Shareholder *if and only if* they receive shares in compliance with the three provisions described below. There is no dispute that the RPM Trust was not an existing Group B Shareholder prior to the 2011 Transfer. [Doc. 12 at 9, ¶ 43.]

**The Immediate Family Provision.** A family tree of Alvina's immediate family as relevant to this dispute, including her nieces and nephews, is as follows:



Eric's father, Herbert, had passed away before the Shareholder's Agreement was executed. [Doc. 55 at 3-4, ¶ 5.] By including Alvina's "nieces and nephews" in the Immediate Family Provision, the parties expanded that category of potential Permitted Transferees to capture Herbert's children and encompass all of Bruno's grandchildren. The parties did not include members of the fourth generation

12

descended from Bruno Bischoff, such as Alvina's grandnieces, grandnephews, or grandchildren, as part of Alvina's immediate family.

**The Alvina Trust Provision.**  The Alvina Trust was formed in 1988 as an estate planning mechanism to transfer shares previously held by Alvina to a trust for RSM's benefit in a tax-efficient manner.  [Doc. 49-16 at 5-6, ¶ 5.]  It terminated within two years of execution of the Shareholder's Agreement.  [*Id*.]

**The Right of First Refusal.**  Under Paragraph 4, an existing Group B Shareholder may transfer shares to any recipient via a bona-fide transaction, but only if they satisfy two conditions.  First, the Group B Shareholder must first offer all of their shares to the Company and other existing Shareholders pursuant to a contractually-mandated order of priority (the "Right of First Refusal" or "ROFR").  [Doc. 49-1 at 9-11, ¶¶ 4(a)-(d).]  Second, only if those existing Shareholders and the Company do not exercise their ROFR may a Shareholder sell their shares to a third party.  [*Id*. at 14, ¶ 4(i).]

### C. From 2011 to 2016, the RSM Trust Purports to Transfer Its Shares to the RPM Trust Without Notifying Eric.

RPM is RSM's son and, as Bruno's great-grandchild, a fourth generation family member.  [Doc. 55 at 5, ¶ 17.]  From 2011 to 2016, RSM, through various trusts (referred to collectively as the "RSM Trust" for ease of reference), purported to transfer Boar's Head shares to the RPM Trust.  [Doc. 1 at 9, ¶¶ 27-29, 32.]

**1. In 2011, the RSM Trust Purports to Transfer 2.4 Shares (Representing 0.05% of the Company) to the RPM Trust Pursuant to the Immediate Family Provision.**

On September 14, 2011, the RSM Trust purported to transfer 2.4 shares of Boar's Head stock (representing 0.05% of the Company) to the RPM Trust, which never before held Boar's Head shares (the "2011 Transfer"). [Doc. 55 at 5, ¶ 19.] The documents purporting to effectuate that transfer (the "2011 Transfer Documents") state that RPM was an active employee "as defined in [the Company's] Shareholder's Agreement"—which is a requirement for receiving shares under the Immediate Family Provision. [Doc. 47-6 at 9.]

**2. In 2013 and 2016, the RSM Trust Purports to Transfer 720 Shares (Representing 15% of the Company) to the RPM Trust.**

On December 31, 2013, the RSM Trust purported to transfer 480 shares of Boar's Head stock (or 10% of the Company) to the RPM Trust (the "2013 Transfer"). [Doc. 55 at 5, ¶ 20.] On April 7, 2016, the RSM Trust purported to transfer another 240 shares (or 5% of the Company) to the RPM Trust (the "2016 Transfer" and, together with the 2011 and 2013 Transfers, the "Three Transfers"). [*Id.* ¶ 21.]

**3. RSM's and the Company's Concealment of the Three Transfers Following Eric's Departure from Boar's Head.**

Eric did not receive notice of any of the Three Transfers at or around the time they were made. He only learned when and to whom the Three Transfers were made years later in February 2019 when, for the first time, he received a schedule of ownership changes. [Doc. 47-11 at 9 (Interrogatory No. 3); Doc. 56-10.]

14

The Company concealed this information from Eric despite its agreement in 2008 to keep Eric apprised of any ownership changes following his departure from the Company.  Specifically, in 2008, following more than three decades of working at Boar's Head, including over two decades as an owner, Eric's employment terminated pursuant to a settlement agreement that resolved a separate litigation between, among others, Eric, RSM, their trusts, and the Company.  [Doc. 49-4 at 3 (10:11-14); Doc. 55 at 4, ¶ 14; Doc. 49-16 at 5, ¶ 4; Doc. 56-1 at 7 (RFA No. 27).]

Following the 2008 settlement agreement, the Company purported to have Steven Kourelakos, the Company's Chief Financial Officer, update Eric about Company affairs.  [Doc. 56-4 at 5 (161:1-15).]  However, unbeknownst to Eric, while Mr. Kourelakos provided Eric with biannual updates on Company operations, he did not inform Eric about any changes in ownership until 2015, when he disclosed to Eric, for the first time, that RPM was an owner of the Company.  [Doc. 56-3 at 4-5 (75:20-76:23); Doc. 56-4 at 6-7 (192:4-193:5); Doc. 56-5 at 6 (102:21-24).]  Thus, between 2008 and 2015, Eric was misled into believing there had been no ownership changes at all.

When Eric finally learned in 2015 that RPM purportedly had become an owner of Boar's Head, Eric was not told when the transfers had occurred.  Soon thereafter, Eric e-mailed Mr. Kourelakos and asked if he could send him "the latest ownership breakdown *now that* [RPM] is an owner," and listed for reference the

current ownership breakdown he had, which did not include the RPM Trust.  [Doc. 56-4 at 6-7 (192:4-193:5) (emphasis added).]

Eric, however, was not provided the basic shareholder list he requested until 20 months later, when Mr. Kourelakos sent him an ownership breakdown that *did not disclose* the 2011 Transfer.   [Doc. 47-13.]   Instead, the ownership list Mr. Kourelakos provided to Eric only included ownership percentages as of **January 1, 2014** going forward, obfuscating the fact that the first Transfer had occurred almost three years prior to that date.  [*Id.*]

Eric continued following up for details concerning when and to whom share transfers had been made, and on February 13, 2019, Mr. Kourelakos finally provided a schedule of ownership changes that had occurred since the 2008 settlement agreement.  [Doc. 47-11 at 8-9 (Interrogatory No. 3).]  That was the first indication Eric received that a transfer of a 0.05% interest in Boar's Head had been made to the RPM Trust on September 14, 2011.

In September 2022, following the close of discovery in this action but during discovery in a separate litigation commenced against Eric in the Southern District of New York by another Company owner, Frank Brunkhorst III ("Frank"), evidence emerged that the owners of the Company had intentionally concealed from Eric

16

information about changes to the Company's ownership following the 2008 settlement.

As Eric explained in his motion to supplement his opposition to RSM's summary judgment motion (specifically with respect to Eric's equitable estoppel defense), discovery in the New York litigation revealed that, in July 2009, Frank and other Company owners were inquiring about whether they could "dispose of one share . . . *without Eric's knowledge* [?]" [Doc. 70 at 3-4, ¶¶ 8-9 (emphasis added); Doc. 70-3 at 1-2, ¶¶ 2-5.] As such, hardly a year after Eric's departure from the Company, the Company's owners[3] were plotting how to hide matters relating to Boar's Head ownership from Eric and, in fact, successfully did so.

## II.    DISTRICT COURT PROCEEDINGS

### A. Procedural History

On October 4, 2019, Eric initiated an arbitration against RSM challenging the Three Transfers. [Doc. 1 at 2.] Two weeks later, on October 26, 2019, RSM filed a complaint seeking a declaration that the Three Transfers were permitted under the Shareholder's Agreement. *Robert S. Martin v. Eric Bischoff*, No. 8:19-cv-02671, Doc. 1 (Oct. 26, 2019).

---

[3] RSM and Frank both were board members of the Company throughout the time the Company kept ownership information from Eric, including at the time of the 2011 Transfer. [Doc. 47-6 at 9, 12.]

Soon thereafter, Eric and RSM agreed to toll the statute of limitations during a standstill period.  [Doc. 1 at 2.]  RSM voluntarily dismissed his complaint and Eric withdrew his notice of arbitration, each without prejudice.  [*Id.*]

On May 1, 2021, following the expiration of the standstill and tolling periods, RSM commenced an action for declaratory judgment against Eric in the district court.  [Doc. 1.]  In lieu of re-filing his arbitration, on June 1, 2021, Eric filed his Answer, Counterclaim, and Third-Party Complaint.  [Doc. 9.]

### 1.  RSM's Claims

RSM sought a declaration that each of the Three Transfers to the RPM Trust was made "to an eligible transferee under the terms of the Shareholder's Agreement[.]"  [Doc. 1 at 6, ¶ 16(a).]  RSM also sought declarations as to his affirmative defenses to Eric's challenges to the Three Transfers, including: (i) a declaration that Eric's challenge to the 2011 Transfer is time-barred, and thus the 2013 and 2016 Transfers were properly made to an existing Shareholder [*id.* ¶ 16(b)]; and (ii) a declaration that Eric is estopped from challenging the Transfers based on Eric's purported knowledge of, and acquiescence to, the Transfers.  [*Id.* ¶ 16(c); *see also id.* at 14, ¶¶ 57-58.]

## 2. Eric's Counterclaims

Eric asserted Counterclaims against RSM for breach of contract and declaratory judgment with respect to the Three Transfers. [Doc. 9 at 38-41, ¶¶ 61-77.]

Eric's breach of contract counterclaim alleged that RSM breached the Transfer Restrictions in the Shareholder's Agreement by attempting to make the Three Transfers, which were not permitted under the Shareholder's Agreement. [*Id.* at 38-39, ¶¶ 61-67.]

Eric's declaratory judgment counterclaim sought a declaration that, among other things, the Three Transfers were void *ab initio* under the Transfer Restrictions because the RPM Trust is not a Permitted Transferee under Paragraphs 3(b) or 4(i) of the Shareholder's Agreement. [*Id.* at 41, ¶ 77.]

## B. The Cross-Motions for Summary Judgment

On June 3, 2022, RSM moved for summary judgment asking the District Court to declare that Eric is "precluded from challenging the Three Transfers and that the Three Transfers are valid and proper[.]" [Doc. 47 at 35.] RSM's principal argument was that Eric is time-barred from challenging the 2011 Transfer and, therefore, the 2013 and 2016 Transfers were permitted because they were made to an existing Group B Shareholder, regardless of whether the RPM Trust was a Permitted Transferee in the first place. [*Id.* at 15-19.] In the alternative, RSM argued

that the RPM Trust was a Permitted Transferee. [*Id.* at 24-35.] In support of his motion, RSM attached as exhibits documents purporting to effectuate the Three Transfers. [*See* Doc. 47-6, 47-7, 47-8 (collectively, the "Transfer Documents").]

On June 10, 2022, Eric moved the District Court for partial summary judgment to declare that the Three Transfers were not made to a Permitted Transferee and were thus void *ab initio*. [Doc. 49.]

In his opposition to RSM's motion for summary judgment, Eric argued, among other things, that RSM is estopped from relying on the statute of limitations as a defense because he concealed the Transfers from Eric for years. [Doc. 56 at 31-33.] On October 14, 2022, Eric moved to supplement his opposition to RSM's motion for summary judgment with the newly-discovered evidence (discussed above) concerning the Company's plan, dating back to July 2009, to conceal ownership changes from Eric. [Doc. 70.]

### C. The District Court Grants in Part and Denies in Part as Moot RSM's Motion for Summary Judgment

On October 27, 2023, the District Court granted in part and denied in part as moot RSM's motion for summary judgment and dismissed Eric's Third-Party Complaint and Counterclaims with prejudice. [Doc. 82 (the "Order").]

*First*, the District Court held that Eric's breach of contract and declaratory judgment claims challenging the 2011 Transfer were *both* subject to the six-year limitations period prescribed by New York Civil Practice Law & Rules ("CPLR")

20

§ 213(2). [*Id.* at 13-19.] With respect to Eric's requested declaration that the 2011 Transfer was void *ab initio*, the District Court held that claim was subject to the six-year limitations period under CPLR § 213(2) because "the substance of it is a contract claim." [*Id.* at 14-19.] Accordingly, the District Court held that Eric's challenge to the 2011 Transfer was time-barred because it took place more than six years before Eric filed his demand for arbitration on October 4, 2019. [*Id.* at 13 (citing to CPLR § 213(2)), 16 (same).]

The District Court declined to "entertain any argument regarding the validity of the 2011 Transfer Documents," which purported to effectuate the 2011 Transfer, because Eric's pleading, which challenged the 2011 Transfer, did not specifically reference the underlying 2011 Transfer Documents. [*Id.* at 17, 18 n.1.]

*Second*, with regard to Eric's breach of contract and declaratory judgment claims challenging the 2013 and 2016 Transfers, the District Court acknowledged that those claims were not time-barred. [*Id.* at 25.] However, the District Court relied on the 2011 Transfer to conclude that the 2013 and 2016 Transfers were validly made to an existing Group B Shareholder and granted summary judgment in RSM's favor. [*Id.* at 25-26.] In reaching that conclusion, **the District Court completely ignored the question of whether the 2011 Transfer complied with the Transfer Restrictions in the Shareholder's Agreement**.

Moreover, despite holding that "the Court is barred from making the specific finding that the 2011 Transfer was valid" due to the expiration of the statute of limitations [*id.* at 25], the District Court, in effect, did so anyway. Specifically, the District Court relied on the 2011 Transfer Documents—which were likewise dated outside of the limitation period—to find that the RPM Trust acquired the transferred 2.4 shares as "a shareholder of Boar's Head." [*Id.* at 26.]

The District Court also interpreted the Shareholder's Agreement itself (but not the Agreement's Transfer Restrictions) with respect to the 2011 Transfer. It relied on language from Paragraphs 3(b)(ii) and 4(i), which state that transferees who receive shares as permitted by the Agreement assume the "Group A or Group B Shareholder" status of the transferring Shareholder. [*Id.* at 26-27.] Viewing those clauses in isolation, the District Court concluded that the RPM Trust had become a Group B Shareholder following the 2011 Transfer because it received its shares from a Group B Shareholder. [*Id.*]

On the foregoing three bases—the supposed time bar applicable to the 2011 Transfer, the 2011 Transfer Documents, and isolated terms from the Shareholder's Agreement—the District Court held the 2013 and 2016 Transfers were "between effectively two Group B Shareholders," which "Paragraph 3(b) of the Shareholder's Agreement authorized." [*Id.*]

*Third*, the District Court held that Eric waived his equitable estoppel defense to toll the statute of limitations with respect to the 2011 Transfer because he did not raise that defense in his answer to RSM's Complaint and was thus precluded from raising it "for the first time" in opposition to RSM's motion for summary judgment. [*Id.* at 20-21.]

The District Court also denied Eric's motion to supplement his opposition to RSM's motion for summary judgment as moot on the grounds that "the allegedly newly discovered evidence does not preclude the Court's granting of summary judgment in RSM's favor." [*Id.* at 27.] The District Court noted that, even "assuming *arguendo* that [Eric] could raise the equitable estoppel argument, evidence of any affirmative wrongdoing that occurred before 2015 does not create a genuine issue of material fact" because there is "no genuine issue of material fact as to [Eric's] knowledge of the *2011 Transfer* in 2015." [*Id.* at 28 (emphasis added).]

## III.    STANDARD OF REVIEW

The issues on appeal pertaining to the validity of the Three Transfers (**Part I**) are legal questions of statutory and contractual interpretation. This Court's review is thus *de novo*. *Altman Contractors, Inc. v. Crum & Forster Specialty Ins. Co.*, 832 F.3d 1318, 1321 (11th Cir. 2016) ("Contract interpretation and statutory construction present questions of law subject to plenary review.").

The District Court's finding that Eric waived his equitable estoppel defense (**Part II**) is reviewed for abuse of discretion. *Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1350 n.9 (11th Cir. 2007).

The District Court's holding in the alternative that Eric failed to create a genuine issue of material fact as to all the elements of equitable estoppel because "[t]here is no genuine issue of material fact as to Eric Bischoff's knowledge of the 2011 Transfer in 2015" [Doc. 82 at 28], is subject to the clearly erroneous standard. *Vazquez v. Metro. Dade Cnty.*, 968 F.2d 1101, 1106 (11th Cir. 1992).

## SUMMARY OF ARGUMENT

The District Court held that all Three Transfers were valid because the 2011 Transfer "conclusively established" the RPM Trust as a Group B Shareholder—and, therefore, the 2013 and 2016 Transfers were valid transfers from one Group B Shareholder to another. However, in so holding, the District Court did not assess whether the 2011 Transfer complied with the Shareholder's Agreement's Transfer Restrictions in the first place.

The Shareholder's Agreement provides that any attempted transfer of shares is void *ab initio* unless it complies with the Transfer Restrictions. Thus, unless the 2011 Transfer complied with the Transfer Restrictions, it was void and the RPM Trust could not become a Group B Shareholder. The District Court's failure to conduct that predicate analysis was fatal to its determination that the 2013 and 2016 Transfers were valid transfers from one Group B Shareholder to another.

Critically, even if Eric's claims with respect to the 2011 Transfer were time-barred, that fact did not prohibit the District Court from assessing whether the 2011 Transfer complied with the Transfer Restrictions. The statute of limitations is merely a procedural bar that suspends a party's ability to seek a judicial remedy for an act that occurred outside the prescribed time period; it does not extinguish or alter parties' substantive rights, particularly with respect to acts that occurred within the limitations period. Therefore, regardless of any time bar to Eric's claims challenging

the 2011 Transfer, the District Court still needed to determine whether the 2011 Transfer complied with the Transfer Restrictions in order to sanction the 2013 and 2016 Transfers. Thus, at most, the consequence of the statute of limitations here is that Eric has no ability to require the RPM Trust to return the shares subject to the 2011 Transfer.

The District Court also erred in finding that Eric's declaratory judgment claim challenging the 2011 Transfer is time-barred. Under New York law, the statute of limitations is not a defense to an action seeking a declaration that a contract is void *ab initio*.

Next, as discussed in **Part II**, the District Court abused its discretion by holding that Eric waived his argument that RSM is equitably estopped from asserting a statute of limitations defense. Moreover, the District Court's holding in the alternative that, even if Eric did not waive his equitable estoppel defense, there is "no genuine issue of material fact as to Eric Bischoff's knowledge of the 2011 Transfer in 2015" was clearly erroneous because the record does not support that finding.

This Court should reverse the Order and direct the District Court, on remand, to determine whether the 2011 Transfer complied with the Transfer Restrictions in the first instance or, alternatively, whether RSM is equitably estopped from relying on the statute of limitations defense.

**ARGUMENT**

## I.    THE DISTRICT COURT ERRED AS A MATTER OF LAW BY FINDING THAT THE THREE TRANSFERS WERE VALID.

The Shareholder's Agreement is governed by New York law.  The New York Court of Appeals, New York's highest court, has instructed that "[a]s a general rule, courts *must* enforce shareholder agreements according to their terms" because such agreements "avoid costly, lengthy litigation and promote 'reliance, predictability and definitiveness' in relationships among shareholders in close corporations."  *In re Penepent Corp.*, 750 N.E.2d 47, 50 (N.Y. 2001) (emphasis added) (citations omitted).

As shareholder agreements of closely held corporations often do, the Boar's Head Shareholder's Agreement contains strict Transfer Restrictions that broadly prohibit the disposition of shares except as expressly authorized under the Agreement.  Such transfer restrictions "are a common feature of closely-held corporations" and are "critical to protecting the day-to-day operations of" the corporation. *Vardanyan v. Close-Up Int'l, Inc.*, No. CV-06-2243 (DGT), 2007 WL 4276670, at *4 (E.D.N.Y. Nov. 30, 2007) (citations omitted), *aff'd*, 315 F. App'x 315 (2d Cir. 2009) (Sotomayor, J.).

Rather than enforce the Shareholder's Agreement's Transfer Restrictions by its terms, as required by New York law, the District Court ignored them altogether. The District Court held that, because the 2011 Transfer "conclusively established

[the RPM Trust] as a Group B Shareholder at the time of the 2013 and 2016 Transfers," the 2013 and 2016 Transfers were valid as transfers from one existing Group B Shareholder (the RSM Trust) to another existing Group B Shareholder (the RPM Trust).   [Doc. 82 at 25-26.]   **Critically, in doing so, the District Court conducted no analysis of whether the 2011 Transfer complied with the Transfer Restrictions in the first instance**.   The District Court's holding was erroneous and should be reversed.

*First*, under the plain language of the Shareholder's Agreement, a transfer that fails to comply with the Transfer Restrictions is void and confers no rights whatsoever on the transferee.  Accordingly, the District Court's failure to determine whether the 2011 Transfer complied with the Transfer Restrictions precluded it from properly determining whether the subsequent 2013 and 2016 Transfers were valid transfers from one existing Group B Shareholder to another.

*Second*, it is well-settled that the statute of limitations is only a procedural bar to a judicial remedy; it does not extinguish or alter the parties' underlying contractual rights and obligations.  Therefore, even if Eric is time-barred from seeking a judicial remedy with respect to the 2011 Transfer, that Transfer could not have established the RPM Trust as a contractual Group B Shareholder unless it complied with the Transfer Restrictions.

*Third*, contrary to the District Court's decision, Eric's declaratory judgment

28

claim challenging the 2011 Transfer is not time-barred in any event because, under New York law, the statute of limitations is not a defense to an action seeking a declaration that a contract is void *ab initio*.

### A.    Any Attempted Transfer of Boar's Head Shares <u>Must</u> Comply with the Shareholder's Agreement's Transfer Restrictions.

The Boar's Head Shareholder's Agreement contains strict Transfer Restrictions that broadly prohibit ***any*** kind of disposition of shares—whether voluntarily or involuntarily, direct or indirect, by operation of law, or via a sale, mortgage, assignment, transfer, hypothecation, pledge, creation of a security interest, encumbrance, gift, trust, or otherwise—unless the disposition is expressly authorized by the Shareholder's Agreement.  [Doc. 49-1 at 4-5, ¶ 3(a).]

The Shareholder's Agreement specifies that any attempted disposition that does not comply with the Transfer Restrictions "*shall be void*[.]"  [*Id.* (emphasis added).]

Under New York law, the "shall be void" language means that any attempted transfer of shares that does not comply with the Transfer Restrictions is void *ab initio* ("from the outset")—a legal nullity from the moment the transfer was attempted to have been made, with no legal force or effect whatsoever.  *See, e.g.*, *Genger v. Genger*, No. 651089/2010, 2015 WL 112831, at *11 (N.Y. Sup. Ct. Jan. 7, 2015), *aff'd*, 22 N.Y.S.3d 433, 433-34 (App. Div. 2016) (finding share transfer that violated shareholder's agreement was "void *ab initio*" where agreement provided that

transfers in violation of the agreement "shall be void"); *see also* 22 N.Y. Jur. 2d *Contracts* § 8 (2023) (a void contract is a "mere nullity")[4]; *Void*, Black's Law Dictionary (11th ed. 2019) (defining void as "[o]f no legal effect").

Moreover, a void transfer of shares does not confer any shareholder rights on the recipient of the shares. *Vardanyan*, 2007 WL 4276670, at *4 (the purported recipient of the void transfer "has no rights in [the corporation] or its shares").

As relevant here, Paragraphs 3(b)(ii) and 4(i) of the Shareholder's Agreement provide limited exceptions to the general prohibition on the disposition of shares. They permit transfers by existing Group B Shareholders to four categories of Permitted Transferees: (1) other Group B Shareholders (or trusts for their benefit); or recipients that do not already own shares if they satisfy the (2) Immediate Family Provision (or trusts for the benefit of such recipients); (3) Alvina Trust Provision; or (4) to other recipients, if the Group B Shareholder complies with the Right of First Refusal Provision. [Doc. 49-1 at 5, ¶ 3(b).] RSM admits that the RPM Trust was not an existing Group B Shareholder at the time of the 2011 Transfer. [Doc. 12 at 9, ¶ 43.] Accordingly, in order for the 2011 Transfer to have complied with the Transfer Restrictions, the RPM Trust must have been permitted to receive shares

---

[4] New York Jurisprudence is an authoritative treatise on New York law, which is regularly relied on by New York courts. *See, e.g.*, *Est. of Re by Coarsely v. Kornstein Veisz & Wexler*, 958 F. Supp. 907, 919 (S.D.N.Y. 1997) (listing N.Y. Jur. as one of New York's "leading legal treatises").

under the Immediate Family Provision, the Alvina Trust Provision, or the Right of First Refusal Provision. [Doc. 49-1 at 5, ¶ 3(b); *see also* Factual Background at I(B)(2).]

In the proceedings below, the parties vigorously disputed whether the RPM Trust was an eligible recipient under the Immediate Family and Alvina Trust Provisions.[5] No party asserted that the Right of First Refusal Provision applied. Remarkably, however, the District Court held that the 2011 Transfer—and, as a result, the 2013 and 2016 Transfers—were valid **without ever addressing whether the 2011 Transfer complied with the Transfer Restrictions, much less whether**

---

[5] As discussed above in Factual Background at I(B)(2), the Immediate Family Provision applies to Alvina Martin's "immediate family" members or a trust for their benefit, and the Alvina Trust Provision applies to a beneficiary of the Alvina Trust "to whom Shares are permitted to be transferred under the terms of the Trust Agreement" as of 1991. [Doc. 49-1 at 5, ¶ 3(b)(ii).]

With respect to the **Immediate Family Provision**, Eric argued that grandchildren (such as RPM) are not part of Alvina's "immediate family" based on the plain, dictionary definitions of that term, which ubiquitously exclude grandchildren. [Doc. 49 at 21-35; Doc. 61 at 2-6.] RSM argued that "immediate family" includes grandchildren and even more remote descendants. [Doc. 47 at 30-35.]

With respect to the **Alvina Trust Provision**, Eric argued that the RPM Trust was not a beneficiary of the Alvina Trust permitted to receive shares under the terms of that Trust Agreement because, among other reasons, it was created more than a decade after the Alvina Trust terminated. [Doc. 49 at 35-42.] RSM argued that *all* of Alvina's descendants are eligible to receive shares under the Alvina Trust Provision. [Doc. 47 at 34-30.]

**the RPM Trust was a Permitted Transferee**.  [Doc. 82 at 25-26.]  That was reversible error for the reasons discussed below.

### B.    The District Court Erred by Failing to Assess Whether the Three Transfers Complied with the Transfer Restrictions.

The District Court held that the "2011 Transfer stands because [Eric's] challenge to it is time barred" [Doc. 82 at 29] yet it proceeded to, in effect, determine that the 2011 Transfer validly established the RPM Trust as a Group B Shareholder based on: (i) the 2011 Transfer Documents that purported to effectuate the Transfer; and (ii) select language from the Shareholder's Agreement, which the District Court viewed in isolation and out of context.  [*Id.* at 25-26.]

The District Court's failure to assess whether the 2011 Transfer complied with the Transfer Restrictions was reversible error and fatal to its holding that the 2013 and 2016 Transfers were valid.

*First*, even if Eric's claims challenging the 2011 Transfer are time-barred (which, as set forth below in Section I(C), they are not), that procedural time bar does not exempt the 2011 Transfer from the Shareholder's Agreement's Transfer Restrictions so as to establish the RPM Trust as a Group B Shareholder.

*Second*, the District Court's reliance on the 2011 Transfer Documents and select language from the Shareholder's Agreement was misguided.  Absent a finding that the 2011 Transfer complied with the Transfer Restrictions, the 2011 Transfer Documents, which purported to effectuate the transfer, are meaningless because,

under New York law, documents purporting to effectuate a void transfer of shares are just as void as the underlying transfer. Further, the isolated language from the Shareholder's Agreement only highlights the District Court's error because, when viewed in context, the full provisions make clear that the RPM Trust could not have become a Group B Shareholder as a result of the 2011 Transfer unless the Transfer complied with the Shareholder's Agreement's Transfer Restrictions.

Accordingly, this Court should reverse the District Court's grant of partial summary judgment in RSM's favor.

### 1. The Statute of Limitations Does Not Exempt the 2011 Transfer from the Transfer Restrictions.

The statute of limitations is a mere procedural bar that suspends Eric's ability to seek judicial relief concerning the 2011 Transfer; it does not alter or extinguish the parties' rights and obligations under the Shareholder's Agreement so as to exempt the 2011 Transfer from complying with the Transfer Restrictions.

It is a fundamental tenant of Anglo-American jurisprudence that the statute of limitations defense "acts as a bar to the **_remedy_** by [judicial] action after a certain stated period," but "does not extinguish the debt or the underlying obligation, right, or liability" under a contract. 75 N.Y. Jur. 2d *Limitations and Laches* § 23 (2023) ("N.Y. Jur.") (emphasis added); *see also* 1 Moore's Manual - Federal Practice and Procedure § 10.03 (2023) ("[A] statute of limitation is a procedural bar to recovery that does not affect the validity of the underlying right."). According to a leading

New York treatise, "[t]he theory of the statute of limitations generally followed in New York is that the passing of the applicable period does not wipe out the substantive right; it merely suspends the remedy."  David D. Siegel & Patrick M. Connors, N.Y. Prac. § 34 (6th ed. 2023).

Unlike a statute of repose, which is a jurisdictional bar that "creates an absolute barrier to a plaintiff's right of action," a statute of limitations is a procedural bar that merely suspends the "remedy rather than the right" and "does not, after the prescribed period, destroy the cause of action."  N.Y. Jur. § 23.  As a result, the "expiration of the statutory limitations period *does not cure the underlying wrong*," but merely "extinguishes the right to judicial relief."  *Id.* (emphasis added).

Indeed, the United States Supreme Court has recognized that, because "the traditional rule is that expiration of the applicable statute of limitations merely bars the remedy and does not extinguish the substantive right," a dismissal on statute of limitations grounds in one jurisdiction does not necessarily have a claim-preclusive effect in other jurisdictions with longer unexpired limitations periods.  *Semtek Int'l Inc. v. Lockheed Martin Corp*., 531 U.S. 497, 504 (2001).

In recognition of this fundamental principle, New York courts, in decisions spanning more than 150 years, have determined parties' rights and obligations under contracts *even though* the parties' claims concerning those rights and obligations

34

were time-barred. *See Johnson v. Albany & Susquehanna R.R. Co.*, 54 N.Y. 416, 422-25 (1873) (collecting cases).

For example, in 1873, New York's highest court in *Johnson* applied the "well settled" principle that "the statute of limitation acts on the *remedy* merely, not upon the *debt*, and, therefore, does not impair the obligation of the contract." *Id.* at 424 (emphasis in original). *Johnson* involved a dispute over a stock subscription agreement that required the subscriber to make certain payments in order to receive the stock certificates in question. It was undisputed that the subscriber made some—but not all—of the required payments. *Id.* at 422-23. In an earlier proceeding, the company had sued the subscriber to compel the remaining payments, but the court held the company's claim was time-barred by the six-year limitation period contained in the predecessor to CPLR § 213(2). *Id.* at 422-24.[6]

In *Johnson* itself, the subscriber sued the company to compel it to issue the subject shares and argued that, because the company was time-barred from enforcing the subscriber's payment obligations, the subscriber became an owner of the stock in question despite their failure to pay. *Id.* However, the Court of Appeals rejected the subscriber's attempt to use the statutory time bar in that way. *Id*. at 424-25. The

---

[6] When *Johnson* was decided, the limitations period for actions "upon a contract, obligation, or liability, express or implied" was prescribed by N.Y. Code of Civil Procedure § 91 (1855), which provided for a six-year limitation period. *See Mason v. Henry*, 31 N.Y.S. 1068, 1070 (Gen. Term 1895), *aff'd,* 46 N.E. 837 (N.Y. 1897).

court reasoned that, even though the statute of limitation barred the company's ability to "recover and *collect* anything more *by action*," that "mere statutory bar" does not have any "effect or operation whatever" on the subscriber's payment obligations under the subscription agreement and does "not establish or show that the whole of [the required payments] is paid or extinguished." *Id.* Likewise, any statutory bar that might apply to Eric's claims challenging the 2011 Transfer has no "effect or operation whatever" on the applicability of the Shareholder's Agreement's Transfer Restrictions on the 2011 Transfer and does not imbue the RPM Trust with Group B Shareholder status.

Other New York courts similarly have held that the expiration of the statute of limitations does not affect the parties' underlying contractual rights or obligations. For example, in *Hulbert v. Clark*, the Court of Appeals held that a mortgage continues to exist as a valid lien even if an action to collect payment may be time-barred, reasoning that "[t]he statute of limitations does not, after the prescribed period, destroy, discharge, or pay the debt, but it simply bars a remedy thereon." 28 N.E. 638, 638 (N.Y. 1891) (collecting cases).

More recently, in *Bank of N.Y. Mellon v. WMC Mortg., LLC*, the court held that a time bar on a loan administrator's claim to enforce an originator's repurchase obligations "does not affect the existence of the obligation itself," noting that the fact that a statute of limitations defense can be waived "further prov[es] that a

contractual obligation does not cease to exist after a claim for breach becomes time-barred." 39 N.Y.S.3d 892, 898 (N.Y. Sup. Ct. 2016); *see also Wagner v. Pegasus Cap. Advisors, L.P.*, No. 654613/2019, 2020 WL 6114704, at *2 (N.Y. Sup. Ct. Oct. 16, 2020) (noting that time bar on the lender's claim does "not extinguish [the lender's] underlying right to repayment but merely would bar a court remedy"), *aff'd*, 150 N.Y.S.3d 718 (App. Div. 2021).

The same logic applies here. A statutory time bar on Eric's claims challenging the 2011 Transfer as void for failure to comply with the Transfer Restrictions does not mean that the 2011 Transfer is valid. Nor does the expiration of the limitation period otherwise "produc[e] any presumption" that the 2011 Transfer complied with the Shareholder's Agreement's Transfer Restrictions or exempt it from the Transfer Restrictions altogether. *Johnson*, 54 N.Y. at 424-25.

Accordingly, even if Eric is time-barred from seeking a *judicial remedy* with respect to the 2011 Transfer, that time bar cannot, as a matter of law, confer Group B Shareholder status on the RPM Trust and sanction the subsequent 2013 and 2016 Transfers. At most, the inability to obtain a remedy for the void 2011 Transfer would result in the RPM Trust continuing to hold a few shares. As such, the RPM Trust

would be a Company "shareholder" but not a "Group B Shareholder" under the Shareholder's Agreement.

The New York Appellate Division's decision in *Kavanaugh v. Kavanaugh* makes clear the distinction between merely owning company shares, *i.e.*, being a "shareholder," and being a "Shareholder" pursuant to the terms of a shareholders' agreement. 161 N.Y.S.3d 558, 564-65 (App. Div. 2021). At issue in *Kavanaugh* were certain provisions in a close corporation's shareholders' agreement that, by its terms, applied to "Shareholders." *Id.* at 564. The court held the provisions in dispute applied only to the "Shareholders" as defined in that agreement, and not to two other individuals who owned shares in the company. *Id.* at 564-65. The court held that, while those two individuals were "shareholders in the colloquial sense of the term," they were not a "'Shareholder' to whom the [provisions] of the [shareholders' agreement] applied." *Id.*

Therefore, at most, a time bar on Eric's claims challenging the 2011 Transfer would permit the RPM Trust to retain the 2.4 shares it received, but it would not endow the RPM Trust with the contractual designation of Group B Shareholder so as to allow the RPM Trust to receive shares in that capacity in future transfers. In order to make that latter finding, the District Court was required to conduct the predicate analysis of whether the 2011 Transfer actually complied with the Transfer Restrictions. By skipping that analysis altogether in finding that the 2011 Transfer

38

established the RPM Trust as a Group B Shareholder, the District Court effectively used the statute of limitations to exempt the 2011 Transfer from the Transfer Restrictions. That was reversible error.

Indeed, given that _RSM_ was the one who initiated this action to seek a determination that the 2011 Transfer was valid, any supposed time bar on Eric's claims challenging the 2011 Transfer should not have factored into the District Court's determination regarding the validity of the 2011 Transfer, much less the 2013 and 2016 Transfers.

### 2. The 2011 Transfer Documents and Isolated Language from the Shareholder's Agreement Are Meaningless Unless the 2011 Transfer Complied with the Transfer Restrictions.

The District Court's opinion demonstrates that the statute of limitations does not bar the District Court from determining the validity of the 2011 Transfer under the Shareholder's Agreement. Despite holding that it is "barred from making the specific finding that the 2011 Transfer was valid" because of the statute of limitations [Doc. 82 at 25], the District Court, in effect, did just that: The District Court held the 2011 Transfer "conclusively established" the RPM Trust as a Group B Shareholder based on (i) the 2011 Transfer Documents and (ii) isolated language from the Shareholder's Agreement that the District Court interpreted out of context. [_Id._ at 26-27.] That was error.

*First*, the District Court relied on the 2011 Transfer Documents, which purported to assign and transfer to the RPM Trust "all rights" in the shares "as a shareholder of" Boar's Head.  [Doc. 82 at 26.]  But, as provided under the Shareholder's Agreement, the Shareholder's Agreement—not the Transfer Documents—governs the permissibility of the Transfers.  [Doc. 49-1 at 33, ¶ 10 (providing that the Shareholder's Agreement governs all of the issued and outstanding shares of the Company).]  Therefore, unless the 2011 Transfer complied with the Transfer Restrictions in the Shareholder's Agreement, the 2011 Transfer was void and, by extension, the 2011 Transfer Documents were also void.  *See Genger*, 2015 WL 112831, at *11 (finding that a transfer agreement effectuating a void transfer "was also void or deemed void" because the transfer agreement is "not independent of" the void transfer itself); *see also Vardanyan*, 2007 WL 4276670, at *7 (voiding share transfer that violated contractual transfer restrictions and the transfer agreement purporting to effectuate the transfer).

*Second*, the District Court relied on—and interpreted out of context—isolated clauses from **Paragraph 3(b)(ii)** and **Paragraph 4(i)** of the Shareholder's Agreement stating that a recipient of shares who is not yet an existing Shareholder takes the shares "as a member of the Group of the transferring shareholder."  [Doc. 82 at 26-27.]  But those clauses prove Eric's point, as they make clear that such a

transferee assumes the contractual status of Shareholder *only if* they receive shares in compliance with the Transfer Restrictions set forth earlier in those paragraphs.

With regard to **Paragraph 3(b)(ii)**, the District Court interpreted the underlined language at the end of the paragraph without giving due consideration to the preceding language set forth in bold:

> [A] Group B Shareholder may at any time sell or otherwise transfer any or all of its or his Shares to . . . **any other member of Alvina Martin's immediate family** [the Immediate Family Provision]. . . **or to a beneficiary of the Alvina Martin 1988 Trust to whom Shares are permitted to be transferred under the terms of the Trust Agreement creating such Trust as in effect on the date hereof** [the Alvina Trust Provision]; provided, however, that the transferee shall take such Shares subject to, and shall be fully bound by, the terms of this Agreement as if such transferee were a party hereto as a Group A or Group B Shareholder, as the case may be . . .

[Doc. 49-1 at 5-6, ¶ 3(b)(ii) (emphasis added).]

Thus, Paragraph 3(b)(ii), read in its entirety, plainly provides:  (1) "the transferee" refers to an individual or trust who receives shares from a Group B Shareholder pursuant to the Immediate Family or Alvina Trust Provisions; and (2) any such Immediate Family or Alvina Trust Provision transferee "shall take such Shares subject to, and shall be fully bound by, the terms of this Agreement *as if such transferee* were a party hereto as a Group A or Group B Shareholder, as the case may be . . . ."  [*Id.* (emphasis added).]  Paragraph 3(b)(ii) says nothing about, and therefore does not apply to, any other type of transferee.

The District Court, however, read language in Paragraph 3(b)(ii) out of context to conclude that the RPM Trust had become a Group B Shareholder by virtue of the 2011 Transfer.  In doing so, the District Court, in contravention of New York law, failed to give effect to the contractual condition that the RPM Trust could achieve Group B Shareholder status under the Shareholder's Agreement only if it received shares pursuant to a transfer that complied with the Transfer Restrictions. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp*., 595 F.3d 458, 467 (2d Cir. 2010) (courts should read contracts "as a whole to ensure that undue emphasis is not placed upon particular words and phrases" and "to safeguard against adopting an interpretation that would render any individual provision superfluous") (citations and quotation marks omitted).

Further, **Paragraph 4(i)** has no bearing on the 2011 Transfer or the subsequent Transfers because it pertains only to the Right of First Refusal, which has no applicability to this dispute.  Specifically, the language the District Court relied on (underlined in the block quote below) applies *if and only if* the transferring Shareholder first offers their shares to other existing Shareholders and the Company, and neither of those parties elect to purchase the shares:

> **In the event that there is no election [by existing Shareholders and the Company] to purchase all the Shares offered for sale pursuant to the provisions of this Paragraph 4**, the offering Shareholder shall have the right to sell or exchange any or all of such Shares in a bona fide transaction, . . . provided, however, that . . . <u>such</u>

> transferee takes such Shares pursuant to the terms of this
> Agreement and as a member of the Group of the
> transferring Shareholder …

[Doc. 49-1 at 14, ¶ 4(i) (emphasis added).]

In its Order, the District Court ignored that this provision is limited to "such transferee" that obtained shares after the existing Shareholder first offered shares pursuant to the Right of First Refusal (bolded in the block quote above) and that it is undisputed that the RSM Trust never offered to sell its shares pursuant to Paragraph 4 before purporting to make the 2011 Transfer. [Doc. 56-1 at 6 (RFA No. 19).] Thus, Paragraph 4(i) is irrelevant to the 2011 Transfer.

Accordingly, the District Court erred by placing "undue emphasis" on "particular words and phrases" in Paragraphs 3(b)(ii) and 4(i) that apply only if a Shareholder first complies with the conditions precedent prescribed by Paragraphs 3(b)(ii) and 4(i), thereby failing to interpret those paragraphs in their entirety. *Bailey v. Fish & Neave*, 868 N.E.2d 956 (N.Y. 2007); *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218 (2d Cir. 2019) (reversing lower court's interpretation of arbitration provision that had failed to read the provision "in its entirety").

### C. Eric's Declaratory Judgment Counterclaim Challenging the 2011 Transfer Is Not Time-Barred.

The District Court's failure to assess the validity of the 2011 Transfer was erroneous for the additional reason that Eric's declaratory judgment counterclaim challenging the 2011 Transfer is not time-barred. Under controlling New York

authority, that claim is not subject to the six-year limitation period under CPLR §
213(2).

> **1. Under New York Law, the Statute of Limitations Is Not a Defense to an Action Seeking a Declaration That a Contract Is Void *Ab Initio*.**

As an initial matter, Eric's declaratory judgment counterclaim, which seeks a
declaration that the 2011 Transfer was void *ab initio*, necessarily encompasses a
claim to declare as void *ab initio* the Transfer Documents purporting to effectuate
the Transfer.  This is because, under New York law, documents purporting to
effectuate a void transfer "[are] not independent of" the transfer itself.  *Genger*, 2015
WL 112831, at *11.  Therefore, if a share transfer is void in violation of a
shareholders' agreement, that means "the transfer agreement effectuating the invalid
[transfer] was also void or deemed void."  *Id.*; *see also Vardanyan*, 2007 WL
4276670 at *7 (voiding share transfer that violated contractual transfer restrictions
and the transfer agreement purporting to effectuate the transfer).

There is a fundamental distinction between Eric's counterclaim, which seeks
a declaration that the 2011 Transfer (and, by extension, the related Transfer
Documents) was void *ab initio*, and a claim "upon a contractual obligation or
liability" within the purview of CPLR § 213(2).  A void contract "is not a contract
at all, and is without legal effect."  17A Am. Jur. 2d *Contracts* § 9 (2024); *see also
Hetchkop v. Woodlawn at Grassmere, Inc.*, 116 F.3d 28, 32 (2d Cir. 1997) (a void

contract is a "nullity").  Accordingly, by definition, an action seeking a declaration that the 2011 Transfer Documents are void *ab initio* is not an action "upon a contractual obligation or liability" because the whole premise of the action is to seek a declaration that the Transfer Documents were of no legal effect in the first place.

In recognition of that distinction, New York's highest court has held on two separate occasions that the statute of limitations is not a defense in actions seeking declarations that a contract or similar instrument is void *ab initio*.  In *Riverside Syndicate, Inc. v. Munroe*, the New York Court of Appeals held that the six-year limitation period under CPLR § 213(2) is not a defense to a claim seeking a declaration that a lease agreement was void *ab initio* because the claim was "not one 'upon a contractual obligation or liability,' but one to declare that no valid contractual obligations ever existed."  882 N.E.2d 875, 878 (N.Y. 2008).  In so holding, the *Riverside* Court relied on *Pacchiana v. Pacchiana*, 462 N.Y.S.2d 256 (App. Div. 1983)—where the Appellate Division had previously exempted a void antenuptial agreement from the statute of limitations—and observed that the statute of limitations "does not make an agreement that was void at its inception valid by the mere passage of time."  *Riverside*, 882 N.E.2d at 878.

Thereafter, in *Faison v. Lewis*, the Court of Appeals, applying *Riverside* and *Pacchiana*, held that the statute of limitations is not a defense in an action seeking a declaration that a forged deed was void *ab initio* because "a statute of limitations

45

'does not make an agreement that was void at its inception valid by the mere passage of time.'" 32 N.E.3d 400, 404-06 (N.Y. 2015) (quoting *Riverside*, 882 N.E.2d at 882). In so holding, the *Faison* court explained that *Riverside*, which concerned a lease agreement, had applied a "rule of general applicability" that "a document void at its inception has no effect and cannot be subject to a statute of limitations." *Id.* at 405.

In the wake of *Riverside* and *Faison*, New York courts have held in various commercial contexts that the statute of limitations is not a defense to an action to declare a contract void *ab initio*. *See, e.g.*, *1650 Realty Assocs., LLC v. Golden Touch Mgmt., Inc.*, No. 005408/11, 2012 WL 12878252, at *5-6 (N.Y. Sup. Ct. Nov. 9, 2012) (relying on *Riverside* to find CPLR § 213(2) inapplicable in action to declare management agreement void *ab initio* because "[t]he purpose of such action is to declare that no valid contractual obligation ever existed; it is not an action 'upon a contractual obligation or liability'") (quoting *Riverside*, 882 N.E.2d at 878); *Auction House 43, Inc. v. Koblence*, 126 N.Y.S.3d 849 (Table), 2020 WL 2044437, at *4 (N.Y. Sup. Ct. 2020) (relying on *Riverside* to reject statute of limitations defense in action seeking a declaration that loan documents were void).

The District Court, in finding that Eric's declaratory judgment counterclaim is time-barred, did not meaningfully address any of these controlling authorities. Its application of CPLR § 213(2) to Eric's declaratory judgment counterclaim simply

cannot be squared with *Riverside*, *Faison*, and their progeny.  For that reason alone, this Court should reverse the District Court's decision.

### 2.  The District Court's Statute of Limitations Analysis Was Flawed as a Matter of Law.

Instead of considering binding authority from New York's highest court, the District Court relied on inapposite cases where, unlike here, CPLR § 213(2) applied because the plaintiffs sought declaratory relief concerning the interpretation of a *valid*, *existing* contract, rather than a declaration that no valid contract existed in the first place.  [*See* Doc. 82 at 15-16 (citing *Contour Constr., LLC v. Kohlbach*, 880 N.Y.S.2d 871 (Table), 2009 WL 792397, at *4 (N.Y. Sup. Ct. 2009) (action "seek[ing] to resolve the interpretation of" an "ambiguous clause" in contract); *Karedes v. Colella*, 790 N.E.2d 257, 260 (N.Y. 2003) (action seeking declaration that professional services contract was valid and enforceable); *Nusca v. Fodera*, 514 N.Y.S.2d 65 (App. Div. 1987) (action seeking declaration that plaintiff was entitled to corporate stock); *Aloi v. Bd. of Educ. of W. Babylon Union Free Sch. Dist.*, 439 N.Y.S.2d 169, 171 (App. Div. 1981) (action seeking declaration of rights under collective bargaining agreement)).]  None of the cases the District Court relied on involved an action seeking a declaration that a contract is void *ab initio*.

In addition to relying on inapplicable authority, the District Court rejected, on two erroneous grounds, Eric's argument that the statute of limitations is not a defense to an action to declare a contract void *ab initio*.  [Doc. 82 at 17-18.]

*First*, the District Court erroneously concluded that Eric's claim is one "upon a contractual obligation" subject to CPLR § 213(2) because "Eric concedes that the Shareholder's Agreement is a valid contract." [*Id.* at 18.]  But that misses the point. Eric is not seeking a declaration that the Shareholder's Agreement is void.  He is seeking a declaration that the 2011 Transfer and related Transfer Documents were void *ab initio*, and the Shareholder's Agreement is the *reason* why they were void *ab initio*.

*Second*, the District Court erred by rejecting Eric's argument that CPLR § 213(2) does not apply because he is seeking a declaration that the 2011 Transfer and related Transfer Documents are void *ab initio*.  [*Id.* at 17 (quoting Doc. 56 at 23).] The District Court wrongly characterized that argument as "unpreserved" on the grounds that Eric's counterclaim, which challenged the 2011 Transfer, did not specifically "reference any related transfer agreements."  [Doc. 82 at 17.]  In doing so, the District Court improperly emphasized form over substance.

Under Federal Rule of Civil Procedure 8 and well-settled Circuit precedent, a complaint "need not specify in detail the precise theory giving rise to recovery." *Plumbers & Steamfitters Loc. No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1448 (11th Cir. 1991).  Rather, "[a]ll that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Id.*

48

Therefore, although a plaintiff may not assert for the first time on summary judgment new *claims* of which the defendant had no notice, a plaintiff may raise additional facts or issues in support of an existing claim. *See, e.g.*, *Davenport v. Thor Motor Coach, Inc.*, No. 3:14-cv-537-J25-PDB, 2015 WL 13021664, at *7 (M.D. Fla. Aug. 6, 2015) (that plaintiff "did not specifically utilize the particular legal term of art in their Complaint" does not preclude them from asserting it on summary judgment), *aff'd per curiam*, 661 F. App'x 997 (11th Cir. 2016).

Eric's challenge to the Transfer Documents is not a new "claim"—rather, it has always been part of Eric's declaratory judgment counterclaim challenging the 2011 Transfer. As the court held in *Genger*, if a share transfer is void in violation of a shareholders' agreement, then that means "the transfer agreement effectuating the invalid [transfer] was also void or deemed void" because the transfer agreement "is not independent of" the transfer. *Genger*, 2015 WL 112831, at *11.

Likewise, in *Vardanyan*, where a share transfer that violated contractual transfer restrictions was deemed void, the court expressly held the transfer agreement effectuating the void transfer also was void *even though* the pleadings only alleged the transfer was void and did not specifically allege that the transfer agreement also was void. *Vardanyan*, 2007 WL 4276670 at *7; *see also* 1:06-cv-02243, Doc. 5 at 51-52 ¶¶ 99-103. Thus, the District Court's conclusion that Eric

had to specifically plead that the "transfer agreements" were void went far beyond what Rule 8's notice pleading standard requires.

Further, the record makes clear that RSM had ample notice that the 2011 Transfer Documents were central to the parties' claims and defenses. In fact, RSM attached the 2011 Transfer Documents as an exhibit to his Motion for Summary Judgment and relied on them as evidence of the purported 2011 Transfer. [Doc. 47 at 16 and 8; Doc. 47-6.] If a party references and addresses a fact or issue in their briefs, that indicates they had sufficient notice of it even if it was not specifically referenced in the other party's pleadings. *See, e.g.*, *Vertex Constr. Co.*, 932 F.2d at 1448 (defendant was on notice of plaintiffs' request to audit cash disbursements journals even though the complaint did not specifically seek an audit of that item because defendant's summary judgment briefs addressed auditing cash disbursements journals).

Indeed, even though the District Court refused to "entertain any argument concerning" the Transfer Documents on the grounds that Eric's pleadings did not specifically reference them, it nevertheless relied on those very Transfer Documents as *evidence* that the 2011 Transfer made the RPM Trust a Group B Shareholder.

[Doc. 82 at 17, 26.]  Thus, the record reflects that RSM had sufficient notice of Eric's challenge to the transfer agreements.[7]

Accordingly, the District Court erred as a matter of law in finding that Eric's declaratory judgment counterclaim challenging the 2011 Transfer is time-barred.

## II.    RSM SHOULD BE EQUITABLY ESTOPPED FROM RELYING ON THE STATUTE OF LIMITATIONS DEFENSE.

In Eric's opposition to RSM's motion for summary judgment, Eric argued that RSM is equitably estopped from relying on the statute of limitations defense because RSM concealed the Three Transfers from Eric.  [Doc. 56 at 31-33.]  The District Court rejected that argument on two grounds.

*First*, the District Court held that Eric should have raised equitable estoppel as an affirmative defense in his pleadings, and his failure to have done so constitutes waiver.  [Doc. 82 at 20-21.]  That determination was an abuse of discretion and should be reversed.

---

[7] *Gilmour* and *Hurlbert*, the cases the District Court relied on to reject Eric's arguments regarding the transfer agreements [Doc. 82 at 17], are distinguishable. There, unlike here, the plaintiffs asserted entirely new claims and statutory bases for recovery of which the defendants had no notice.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004) (rejecting new contract claim asserted for first time on summary judgment because complaint set forth only tort claims); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (rejecting allegations raised on summary judgment as "additional, separate statutory basis for entitlement to leave" under FMLA that was not asserted in complaint).

*Second*, the District Court held in the alternative that, even if Eric had not waived his equitable estoppel defense, Eric failed to create a genuine issue of material fact as to all of the elements of his equitable estoppel defense. [Doc. 82 at 28.] That holding should also be reversed because it was based on the clearly erroneous finding that "[t]here is no genuine issue of material fact as to Eric Bischoff's knowledge of the 2011 Transfer in 2015," which is unsupported by the record. [Doc. 82 at 28.]

### A. The District Court Abused Its Discretion in Finding That Eric Waived His Equitable Estoppel Defense.

To determine whether a defendant waived an affirmative defense by failing to assert it in their pleadings, courts "must avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of" Rule 8(c), which is to ensure that the other party was on notice of the defense with sufficient time to challenge it. *Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir. 1988). This Court has therefore recognized that "a defendant does not waive an affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff," *Edwards v. Fulton County*, 509 F. App'x 882, 887 (11th Cir. 2013) (per curiam) (collecting cases), and has taken a "liberal approach" to Rule 8(c) by not finding waiver "where the failure to raise an affirmative defense has not prejudiced the plaintiff." *Sweet v. Sec'y, Dep't of Corr.,* 467 F.3d 1311, 1321 n.4 (11th Cir. 2006).

If the opposing party "receives notice of an affirmative defense by some means other than the pleadings, 'the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice.'" *Grant v. Preferred Rsch., Inc.,* 885 F.2d 795, 797 (11th Cir. 1989) (quoting *Hassan*, 842 F.2d at 263). "Neglect to affirmatively plead [an affirmative defense] is simply noncompliance with a technicality and does not constitute a waiver where there is no claim of surprise." *Edwards*, 509 F. App'x at 887 (citation omitted).

Here, the basis for Eric's equitable estoppel defense is that the 2011 Transfer was done in secret, and thus Eric had no knowledge of that Transfer. [Doc. 56 at 25-27.] RSM's own pleadings demonstrate that the question of whether, and when, Eric had knowledge of the 2011 Transfer has been at issue since the outset of this action. For example, RSM's Complaint alleged that laches bars Eric from challenging the Transfers because Eric supposedly "was well aware of" the 2011 Transfer "when or shortly after [it] occurred and "learn[ed] of the initial transfer of shares to the [RPM Trust] in the fall of 2011 . . . ." [Doc. 1 at 7-8, ¶¶ 20-23.]

Further, is no genuine dispute that RSM had ample notice of Eric's equitable estoppel defense, as evidenced by the numerous discovery requests *he served* seeking to establish Eric's knowledge of the 2011 Transfer, Eric's responses to

RSM's discovery requests (which sought to dispel the notion that Eric had knowledge of the 2011 Transfer), and deposition testimony on that issue.[8]

Further, it was only through discovery in a separate proceeding—which Eric obtained after the summary judgment briefing closed in this case—that Eric learned of the Company's longstanding plan to conceal ownership changes from Eric. Upon obtaining that discovery, Eric promptly moved the District Court for leave to supplement his opposition to RSM's motion for summary judgment and further buttress his equitable estoppel defense. [*See* Doc. 56 at 25-27; *see also* Doc. 70.]

Ultimately, RSM, as the party asserting waiver, failed to establish that he was prejudiced by Eric's failure to specifically plead equitable estoppel in his answer. *See, e.g.*, *Grant*, 885 F.2d at 797-98 (finding no waiver of affirmative defense because plaintiff did not assert any prejudice from defendant's lateness); *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1222 (11th Cir. 2012) (finding no waiver of affirmative defense because plaintiff failed to show it "suffered any prejudice from the delay in asserting the defense").

---

[8] *See, e.g.*, Doc. 47-11 (Eric's Responses and Objections to RSM's First Set of Interrogatories) at 8 (Interrogatory No. 2 – seeking information "relating to the circumstances by which [Eric] first learned" of the Three Transfers), 9 (Interrogatory No. 3 – seeking information "relating to the circumstances under which [Eric] learned" of 2011 Transfer); Doc. 47-14 (Eric's Responses and Objections to RSM's First Request for Admissions) at 8 (RFA No. 2 – denying that Eric "learned prior to 2013 that Boar's Head shares were transferred to the" RPM Trust); Doc. 56-3 at 10 (102:6-24).

Indeed, RSM did not even attempt to establish prejudice, because there was none. Instead, he argued that Eric waived the defense only because he failed to raise it in his pleadings. [*See* Doc. 60 at 5-6.]

Accordingly, the District Court abused its discretion by finding that Eric waived his equitable estoppel defense without considering whether RSM had notice of the defense or could legitimately claim surprise and prejudice. *See, e.g.*, *Proctor v. Fluor Enters., Inc.*, 494 F.3d 1337, 1351 (11th Cir. 2007) (district court's finding of waiver of affirmative defense was an abuse of discretion because "district court said nothing about, much less made a finding about, whether" the plaintiff "either had notice of" the defense "or would be surprised and prejudiced"); *see also Ahmad v. Furlong*, 435 F.3d 1196, 1203 (10th Cir. 2006) (reversing district court's finding that affirmative defense was foreclosed by failure to plead it in the answer because defendant adequately raised the defense on summary judgment).

The District Court's finding of waiver was based principally on *Keybank National Association v. Hamrick*, 576 F. App'x 884, 1197 (11th Cir. 2014), but that case only serves to demonstrate the District Court's error. In *Keybank*, this Court affirmed a district court's finding of waiver where, unlike here, the court *did* assess whether the plaintiff had notice of, and was prejudiced by, defendants' delay in asserting certain defenses. No. 1:10-CV-04054-JOF, 2012 WL 13006041, at *3 n.6 (N.D. Ga. Aug. 17, 2012). There, the district court held that, while the defendants

waived certain defenses of which plaintiff "had no notice at all," defendants did *not* waive another defense of which the plaintiff "had notice" and "[did] not suffer any prejudice by the [defendants'] failure to fully comply with Rule 8(c)." *Id.* As to the latter, the court noted that the pleadings there, like here, "did generally discuss some of the same underlying conduct" giving rise to the defense and there was deposition testimony on the issue. *Id.*

*Easterwood*, a case also cited by the District Court, further highlights its error. *Easterwood v. CSX Transp., Inc.,* 933 F.2d 1548, 1551 (11th Cir. 1991), *aff'd*, 507 U.S. 658 (1993). There, this Court cautioned against "enforc[ing] strictly the harsh waiver requirement where," like here, "plaintiff is unable to demonstrate any prejudice due to the lack of notice." *Id.*

### B. The District Court Erred in Concluding That There Is No Genuine Issue of Material Fact as to the Elements of Eric's Equitable Estoppel Defense.

Finally, the District Court erred in concluding that, even if Eric could raise the equitable estoppel argument, "evidence of any affirmative wrongdoing that occurred before 2015 does not create a genuine issue of material fact precluding summary judgment" because "[t]here is no genuine issue of material fact as to Eric Bischoff's knowledge of *the 2011 Transfer* in 2015." [Doc. 82 at 28 (emphasis added).]

The District Court was simply wrong about the facts. There is no evidence in the record (and the District Court did not cite any) that establishes Eric's knowledge

of the 2011 Transfer in 2015.  To the contrary, the record reflects that, when Eric learned (incorrectly) in July 2015 that *RPM* had become an owner, he had no idea *when* any of the Transfers had been made, much less that the RPM Trust (the actual owner) had received the shares.  [Doc. 47-11 at 9, 11-12 (Interrogatory Nos. 3, 6); Doc. 56-10.]  After following up for that information, the Company provided him in February 2017 with an incomplete picture that disclosed the owners *as of January 1, 2014 going forward*.  [Doc. 47-13.]  Thus, at that point, Eric *still* had no knowledge that a transfer had taken place in 2011.

It was not until February 2019, when the Company finally provided Eric with a breakdown of all ownership changes since 2008—information RSM and the Company promised to provide Eric after Eric's departure from Boar's Head—that Eric learned of the 2011 Transfer.  [*See* Factual Background above at I(C).]

Thus, when Eric learned in July 2015 that RPM purportedly had become an owner, he had an incomplete picture but diligently pursued the missing details regarding when the Transfers had been made.  Yet, the Company stonewalled Eric's requests for information.  [Doc. 56-10]; *Langston v. MFM Contracting Corp.*, 102 N.Y.S.3d 12, 13 (App. Div. 2019) ("evasiveness in response to plaintiffs' requests for information . . . is an affirmative act of concealment that could give rise to equitable estoppel").

In any event, evidence of RSM's and the Company's concealment and Eric's diligence in bringing a claim raise questions of fact properly resolved at trial, rather than at the summary judgment stage. *Garrett v. Music Publ'g Co. of Am., LLC*, 740 F. Supp. 2d 457, 464 (S.D.N.Y. 2010) ("[a]pplication of equitable estoppel is generally an issue of fact") (denying summary judgment).

Accordingly, even if this Court were to affirm the District Court's holding that Eric's counterclaims challenging the 2011 Transfer are time-barred, the Court should vacate that portion of the District Court's Order finding waiver of Eric's equitable estoppel defense and remand it for further proceedings.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should reverse the District Court's grant of partial summary judgment in RSM's favor, reinstate Eric's Counterclaims challenging the Three Transfers, and remand the case to the District Court for further proceedings.

Dated:  February 28, 2024              Respectfully submitted,

/s/ Michael E. Swartz
Michael E. Swartz

SCHULTE ROTH & ZABEL LLP
Michael E. Swartz
Taleah E. Jennings
Randall T. Adams
Minji Reem
Mark L. Garibyan
919 Third Avenue
New York, New York 10022
Telephone: 212.756.2000

SHUMAKER LOOP &
KENDRICK LLP
Duane A. Daiker
Jaime Austrich
Brian W. Schaffnit
Florida Bar. No. 84565
101 East Kennedy Boulevard
Tampa, Florida 33602
Telephone: 813.229.7600

*Counsel for Appellant Eric Bischoff*

## **CERTIFICATE OF COMPLIANCE**

This document complies with the type-volume limit of Federal Rules of Appellate Procedure 32(a)(7)(B) because, excluding parts of the document exempted by Federal Rules of Appellate Procedure 32(f), this document contains 12,954 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14.

Dated:  February 28, 2024          /s/ Michael E. Swartz
                                    Michael E. Swartz

                                    SCHULTE ROTH & ZABEL LLP
                                    919 Third Avenue
                                    New York, New York 10022
                                    Telephone: 212.756.2000

                                    Counsel to Appellant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 28, 2024, I authorized the electronic filing of the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the email addresses of all counsel of record.

Dated:  February 28, 2024          /s/ Michael E. Swartz
                                   Michael E. Swartz

                                   SCHULTE ROTH & ZABEL LLP
                                   919 Third Avenue
                                   New York, New York 10022
                                   Telephone: 212.756.2000

                                   Counsel to Appellant